UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Larry Griffin, | **COMPLAINT** |
| Plaintiff, | |
| vs. | Court File No._____ |
| Crow Wing Recycling, INC. | **JURY DEMAND** |
| Defendant. | |

---

Plaintiff, Larry Griffin, for his cause of action against Defendant, Crow Wing Recycling, Inc., states and alleges as follows:

**JURISDICTION AND PROCEDURAL BACKGROUND**

1. Plaintiff Larry Griffin ("Griffin") is a resident of the City of Brainerd, County of Crow Wing, State of Minnesota.

2. Defendant Crow Wing Recycling, Inc. ("Crow Wing Recycling") is a domestic business corporation duly authorized to do business in Minnesota with its registered headquarters located at 714 Industrial Park Road SW, Brainerd, Minnesota 56401. Crow Wing Recycling is in the business of recycling scrap metal. Besides its headquarter facility in Brainerd, it has other metal recycling facilities located in Milaca, Backus, and Ironton, Minnesota.

3. Griffin was employed at Crow Wing Recycling from approximately July of 2013 to August of 2015.

4. At all material times herein, Dutch VanWyngeeren has been an owner of Crow Wing Recycling; his son, Grant VanWyngeeren, has been its chief executive officer and also an

owner: Rick Soder ("Soder") has been its human resource director; and Trent Heinz ("Heinz"), Randy (last name unknown), and Dan (last name unknown), have been managerial or supervisory employees of Crow Wing Recycling.

5.     The acts of race discrimination, assault, and negligent supervision that form the basis of Griffin's lawsuit all occurred in Minnesota.

6.     Griffin brings this action to redress the wrongs done to him by Crow Wing Recycling, namely, discrimination based on his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and civil assault and negligent supervision under state common law.

7.     This court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331, 1332. Griffin also invokes supplemental jurisdiction of this Court over his state claims against Defendant for the common law violations pursuant to 28 U.S.C. §1367, as the common law claims form part of the same case or controversy.

8.     Venue for all causes of action stated herein lies in the District of Minnesota as the acts alleged as a basis for the federal claims took place within the boundaries of this state.

## FACTS

9.     Griffin was first employed by Crow Wing Recycling at its Trust Joyce facility in Ironton, Minnesota, and worked on the assembly line picker sorting various types of scrap metal and maintaining the machinery. Subsequently, after about nine months, he transferred to Crow Wing Recycling's Brainerd headquarters where his duties included unloading and processing scrap metal, maintaining the shop and its grounds, and operating some equipment. During the course of Griffin's employment with Crow Wing Recycling, managerial and non-managerial

employees subjected him to demeaning and threatening racially charged comments and racially based physical intimidation invariably accompanied with hostile racial epithets. The brutal racial climate that Griffin worked under was known to Crow Wing Recycling management. Not only did management witness much of the racism firsthand, but management ignored or downplayed Griffin's complaints of the racial discrimination directed at him. The racial slurs and racially based physical intimidation directed at Griffin substantially interfered with his employment by creating an intimidating, hostile, offensive, and generally adverse employment environment that eventually led to his constructive discharge. The conduct of the Crow Wing Recycling employees amounting to race discrimination, assault, and negligent supervision included, but is not limited to, the following:

   a.   Shortly after Griffin began working at the Trust Joyce location in Ironton, there was an occasion when he needed to fix a broken broom so that he could sweep the shop. After he fixed the broom, a co-worker looked at him and said, "Oh look, you nigger-rigged the broom!"

   b.   On another occasion a machine broke down and some workers had to go home. A co-worker responded to this incident—in front of Griffin—by saying, "If we didn't have all these niggers, spics, and Jews we wouldn't have to worry about sending people home. I worked down in South Dakota and none of these people want to work. The nigger Obama has made them all lazy." The co-worker told Griffin, "If it was up to me, I would never hire these niggers, Jews, and spics."

   c.   Co-workers at the Trust Joyce facility told Griffin, "If it isn't white, it isn't right."

   d.   One day Griffin asked Wes, a co-worker, why he was so hateful towards black people. Wes responded, "You black guys take all of our white women. Black guys like you come here and think you can just get a job, and roam around our community. You aren't happy with just one woman. You need three or four of them. If you just stayed with your race then it would be fine."

3

e.  Griffin reported to Randy, the manager of the Trust Joyce facility, that he was being called a nigger. Randy told Griffin to look past it because the other employees are just from a different time. Griffin asked Randy to tell them to stop, but Randy told Griffin, "You know where you live."

f.  When the racial comments continued, Griffin again went to Randy to tell him about the comments. Randy said that all he could do was move Griffin to a different part of the building, but that he would have to be moved with another employee who was also a racist.

g.  John, another co-worker and picker at the Trust Joyce location, repeatedly asked Griffin, "Larry, you ready to be done with working yet?" or, "Did you give your two weeks notice yet?"

h.  After a number of months of working at Crow Wing Recycling's Trust Joyce facility, Griffin moved to Crow Wing Recycling's headquarters in Brainerd to work. Griffin hoped the work environment there would be different. It was not. The racially based torment and ridicule intensified, and the perpetrators' behavior became increasingly threatening and violent.

i.  When Griffin showed up at the Brainerd facility to work, Dan, a supervisor at that facility, along with other employees yelled, "Oh, we got another monkey in here!" When Griffin asked what happened to the previous African-American employee Dan responded, "Oh, you really don't want to know what happened to him!"

j.  Dan then told Griffin, "Don't mind me if I call you a nigger." Griffin asked Dan why he would ever say that to which Dan replied, "I believe, the way that I was raised, is that you all take our white women and that you are all stupid fucking niggers."

k.  Dan and other employees frequently spit at Griffin when they made eye contact with him.

l.  Dan told Griffin on a regular basis that he better quit his job and that he would never be promoted because he was black.

m.  When black customers came to the Brainerd facility Dan would yell to Griffin, "Larry, your brothers are up front!" Dan refused to serve black customers and always called for Griffin to assist them.

n.  When Griffin greeted a customer or spoke to one of the owners, he referred to them as sir or mam. Dan and the other employees would then call Griffin a "cock sucker." One day, Dan said to Griffin, "You might as

   well go and bring Dutch (one of the owners) into the porta potty and suck him off."

o.  Trent Heinz, the manager at Crow Wing Recycling's Brainerd facility, frequently witnessed these discriminatory comments but never took effective action to protect Griffin. The most he ever did was tell the perpetrators "hey now," or "come on now guys." But he did this in front of Griffin and the aggressors which backfired against Griffin because they harassed Griffin even more.

p.  Griffin carried with him in his truck a photograph of his pastor who had recently passed away. His pastor was African American. One afternoon, Griffin went out to the parking lot to grab something from his truck, which he always left unlocked. Dan was standing next to Griffin's truck and below his feet was the photograph of Griffin's pastor crumpled up on the ground and soaked in the mud. Griffin looked up at Dan, who smirked, and said, "Dr. King said he had a dream that niggers and white people would be equal. But that's not the case, Larry, because white is the superior race." Dan snickered at Griffin and then walked away.

q.  To try and escape the harassment, Griffin would wait to eat lunch by himself, but Dan and the other employees would often steal his lunch and hide it. One day someone stole Griffin's lunch from his locker. When Griffin asked Heinz who took his chicken, Trent replied, "Uh oh, somebody took the black guy's chicken!" Then another operator started yelling, "Oh no! Somebody took the nigger's chicken. You better find it!"

r.  On other days when Dan and the other employees took Griffin's food, they told Griffin, "We don't feed the monkeys," or "We don't feed the animals." On a regular basis Dan told Griffin, "We put monkeys in cages. We don't let them run free around here."

s.  Dan once told Griffin, "The reason I try to keep people like you at the bottom of the totem pole is because people like you try to take jobs from people like me, a company man."

t.  The shop had a forklift that Dan would use to transfer materials. Nearly every time Dan operated the forklift he would try to attack Griffin. On the first occasion, Griffin was sweeping up the shop floor. Dan came barreling around the corner on the forklift and swerved into Griffin. Griffin jumped into the corner barely missing the steel forks that were aimed at him. On the other occasions Dan attempted to attack Griffin with the forklift, Dan would speed the forklift towards Griffin, stopping just a few feet in front of him and yell, "Get the fuck out of the way porch monkey!" or "Everyone is not a nigger lover, Larry."

u. The shop also had two large red bins of copper wiring. When Griffin was in the room, Dan would grab a copper wire cord, stand inches away from Griffin and whip the wire up and down on the ground. Dan would yell "You got a pretty mouth boy," and "I'm going to whip you today boy, just like how my ancestors used to do it!" Dan did this approximately two times a week ever since Griffin started working at the Brainerd facility.

v. The racially hostile comments and threatening physical behavior that Griffin was subjected to on daily basis was not the only way Dan and the other employees tormented him. Griffin also received notes in his work locker. The first round of notes began during his second week working at the Brainerd facility. The first note he found said, "We don't feed the monkeys." See Exhibit A attached to this Complaint.

w. Then, about a month-and-a-half later, Griffin received a note in his locker that said, "Note for Larry: Niggers don't belong here."

x. After receiving this second note Griffin reported the incident to Heinz. Heinz told Griffin that they are all sick in the head and that Dan and the other employees believe that Griffin was there to take their jobs. Heinz also told Griffin that reporting the racism won't help him because Rick Soder, Crow Wing Recycling's human resource director, would never do anything about it.

y. Despite Heinz's directive, Griffin went to Soder and told him about the racial incidents. Soder told Griffin that he was already aware of the harassment that the employees subjected him to and directed Griffin to "not pay attention to them" and "to remember where you live." Griffin told Soder that it is very difficult to not pay attention when they leave such racist notes in his locker and that he just wanted to be able to come into work, do his job, and help support his family. Soder told Griffin that they would eventually leave him alone.

z. Soder also responded to Griffin's complaint with a story of his experience in the military with a female African American drill sergeant who he believed targeted him because he was white. Soder told Griffin that he put up with it because he knew his place and that Griffin should do the same with his tormentors.

aa. Two weeks after this discussion with Soder, John, a co-employee, told Griffin, "You know why these guys are doing this, with all of the little notes in your locker, it's because, no offense, your kind has worked here before and caused ruckus with the other employees." Griffin told John he just wanted to earn a living to support his family.

6

bb.  On another occasion, Dan approached Griffin and told him that the employees who work in the office are Dan's "klan buddies." Dan then described to Griffin how he and his Klan get together at the local church and have meetings. Dan moved in very close to Griffin's face and told him that they are going to have a Klan rally for him after work and said, "Larry, you want to come? We are going to have an all white sheet celebration and you are invited." Griffin was terrified and feared that Dan and the other employees were planning to hurt him.

cc.  Griffin already knew that Soder was not going to help him, so Griffin decided to speak with Crow Wing Recycling's owner, Dutch VanWyngeeren. On a Tuesday, two days before Griffin left his employment, Griffin met with Dutch VanWyngeeren and told him about Dan's Ku Klux Klan threat and that he was constantly being subjected to racist comments and conduct in the workplace. Griffin begged Dutch VanWyngeeren to do something about the racist conduct of Dan and the other employees. Dutch VanWyngeeren responded to Griffin by saying, "I told you that you just got to kick them in the balls." Griffin pleaded with him, telling him that this was really serious and that they were monsters. The owner repeated himself and said, "Kick them in the balls."

dd.  Two days later on Thursday, Griffin arrived at work, opened his locker, and found a picture of a stick figure with a noose around its neck. It said, "You don't belong here." See Exhibit B attached to this Complaint. Griffin grabbed his belongings and left his employment at Crow Wing Recycling.

ee.  Crow Wing has a mandatory dollar raise after 90 days of work. In the nearly two years that Griffin worked at Crow Wing he never once received a raise despite this policy. His white co-workers, however, received their raises.

## COUNT ONE
## RACE DISCRIMINATION

10.  Griffin incorporates herein by reference the allegations contained in paragraphs 1 through 9.

11.  Crow Wing Recycling violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) by unfairly discriminating against Griffin when its managers and

supervisors participated in and fostered a work environment that was permeated with racially discriminatory intimidation, hostility, ridicule and insult toward Griffin

12. As a direct and proximate result of these acts of race discrimination by Crow Wing's managers and supervisors, Griffin was constructively discharged. He has and will incur significant wage and benefit loss, and he has experienced and will experience in the future mental anguish and emotional suffering, physical suffering, loss of self esteem, disgrace, and loss of enjoyment of life—all of which has caused him to seek psychological counseling and incur costs of counseling. Griffin is now also forced to incur attorney fees and litigation costs to recover his damages that he is entitled to under the law.

## COUNT TWO
## ASSAULT

13. Griffin incorporates herein by reference the allegations contained in paragraphs 1 through 12.

14. The shop had a forklift that Dan would use to transfer materials. Nearly every time that Dan operated the forklift Dan would try to attack Griffin. On the first occasion, Griffin was sweeping up the shop floor. Dan came barreling around the corner and swerved into Griffin. Griffin jumped into the corner barely missing the steel forks that were aimed towards him. On the other times Dan attempted to attack Griffin, he would speed the forklift towards Griffin, stopping just a few feet in front of him and yell, "Get the fuck out of the way porch monkey!" or "Everyone is not a nigger lover, Larry."

15. The shop also had two large red bins of copper wiring. When Griffin was in the room, Dan would grab a copper wire cord, stand inches away from Griffin and whip the wire up

and down on the ground. Dan would yell, "You got a pretty mouth boy," and "I'm going to whip you today boy, just like how my ancestors used to do it!" Dan did this approximately two times a week ever since Griffin started the office job.

16. Dan's use of the forklift and the copper wire, as described above, constitutes civil assault against Griffin. His use of the forklift and the copper wire, as described above, demonstrated a present ability to carry out the threat of bodily harm against Griffin. And Dan's racially based conduct, as described above, caused Griffin to have a reasonable fear and apprehension of imminent bodily harm.

17. Crow Wing knew or should have known of these acts of assault by Dan against Griffin, and in failing to disavow and put an end to Dan's conduct Crow Wing ratified and became responsible for the conduct of Dan.

18. As a direct and proximate result of these acts of assault by Crow Wing's supervisor, Griffin was constructively discharged. He has and will incur significant wage and benefit loss, and he has experienced and will experience in the future mental anguish and emotional suffering, physical suffering, loss of self esteem, disgrace, and loss of enjoyment of life—all of which has caused him to seek psychological counseling and incur costs of counseling.

## COUNT THREE
## NEGLIGENT SUPERVISION

19. Griffin incorporates herein by reference the allegations contained in paragraphs 1 through 18.

20.   Crow Wing negligently supervised the services of its managers and supervisors because Crow Wing failed to exercise ordinary care in the employment relationship so as to prevent the foreseeable misconduct of its managers and supervisors from causing harm to Griffin.

21.   As a direct and proximate result of Crow Wing's negligent supervision of its managers and supervisors, Griffin was constructively discharged. He has and will incur significant wage and benefit loss, and he has experienced and will experience in the future mental anguish and emotional suffering, physical suffering, loss of self esteem, disgrace, and loss of enjoyment of life—all of which has caused him to seek psychological counseling and incur costs of counseling.

## CLAIM FOR RELIEF

**WHEREFORE**, Plaintiff Larry Griffin demands a JURY TRIAL and prays that he may have and recover against the Defendant Crow Wing Recycling as follows:

1.  For his general and special damages in the presently estimated sum of $5,000,000 that consist of:

    a.  Back pay and front pay;

    b.  Mental anguish and emotional suffering and punitive damages combined for a total of $300,000 pursuant to 42 U.S.C. §1981a(b)(3)(A)-(D);

    c.  Mental anguish and emotional suffering on the assault and negligent supervision claims;

    d.  Unlimited punitive damages on the assault and negligent supervision claims pursuant to Minn. Stat. §549.20 that will be sought in a subsequent motion to amend the pleadings pursuant to Minn. Stat. §549.191;

 e. For all costs, disbursements and attorney fees incurred in this action pursuant to 42 U.S.C. §2000e-5(k); and

 f. For prejudgment interest at the legal rate on all sums awarded.

Date: November 19, 2015

LAW OFFICE OF
SIVERTSON AND BARRETTE, P.A.

/s/ Alf E. Sivertson
Alf E. Sivertson (122233)
Marit M. Sivertson (0392465)
1465 Arcade Street
Saint Paul, MN 55106-1740
Phone: (651) 778-0575
Fax: (651) 778-1149

ATTORNEYS FOR PLAINTIFF
LARRY GRIFFIN



# EXHIBIT A



# EXHIBIT B